[Cite as *In re J.J.*, 2022-Ohio-907.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                         :

[J.J.,                                    :

Jo.J.,                                    :
                    Appellant].
                                          :

                                          :

No. 21AP-166
(C.P.C. No. 18JU-11450)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on March 22, 2022

**On brief:** *Yeura Venters*, Public Defender, and *Robert D. Essex*, for appellant.

**On brief:** *Robert J. McClaren,* for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

LUPER SCHUSTER, P.J.

{¶ 1} Appellant, Jo.J. ("putative father"), putative father of J.J., appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, terminating his parental rights and placing J.J. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} This case involves FCCS's request for permanent custody of J.J., born in July 2018. FCCS originally filed for a temporary order of custody ("TOC") on July 6, 2018 after J.J. tested positive for suboxone, cocaine, and marijuana at birth. The trial court issued the TOC on July 6, 2018 and, after expiration of the TOC by operation of law, FCCS refiled a complaint in the instant case. The instant complaint, filed October 1, 2018 when J.J. was

three months old, alleged J.J. to be an abused, neglected, and dependent child. FCCS stated in the complaint that J.J.'s mother, N.W. ("mother"), has six other children, all of whom are not in her custody or care due to mother's substance abuse issues. Mother tested positive for amphetamines, opiates, fentanyl, marijuana, cocaine, and suboxone at the time of J.J.'s birth. Additionally, mother admitted to ongoing addiction struggles since 2013 and periods of homelessness. The complaint stated putative father was incarcerated and had a criminal history including aggravated assault, carrying a concealed weapon, assault, and possession of drugs.

{¶ 3} The trial court conducted a preliminary hearing on October 1, 2018 and granted TOC to FCCS. Following a continuance to perfect service, the trial court set the matter for trial on December 14, 2018. At the December 14, 2018 hearing, mother did not appear but her counsel was present and stated the parties did not contest the two abuse causes of action. The trial court found J.J. to be an abused child, dismissed the remaining causes of action, converted the TOC to an order of temporary court custody ("TCC"), and the trial court set the matter for an annual review hearing on July 8, 2019.

{¶ 4} Prior to the first scheduled annual review hearing, FCCS filed a motion on June 18, 2019 asking the court to grant a first extension of the TCC on the grounds that mother had not yet completed her case plan objectives and putative father was incarcerated at the Franklin County Community Based Correctional Facility. The trial court granted the extension of the TCC and scheduled the matter for another annual review hearing on January 8, 2020. After the first annual review hearing, putative father sent a letter to the trial court dated July 11, 2019 stating he was currently incarcerated at the Franklin County Jail but that he desired to be transported to court and seek reunification with J.J.

{¶ 5} FCCS then filed a motion on December 9, 2019 for permanent court commitment ("PCC"), also known as permanent custody, of J.J. In the PCC motion, FCCS alleged that J.J. could not and should not be placed with either parent within a reasonable time and that both mother and putative father had failed to substantially remedy the conditions causing J.J. to be placed outside the home. The guardian ad litem for J.J. filed a report on December 30, 2019 recommending the trial court grant the PCC motion.

{¶ 6} On January 14, 2020, the trial court appointed counsel for putative father, and counsel filed a demand for discovery that same day. At a subsequent July 7, 2020

hearing, putative father did not appear. Putative father's counsel accepted service on his behalf, and the trial court continued the matter for a trial to be held on January 7 and January 21, 2021. Prior to the scheduled trial date, the guardian ad litem filed another report on December 28, 2020 again recommending the trial court grant the PCC motion to FCCS for purposes of adoption.

{¶ 7} At the January 7, 2021 trial date, putative father again did not appear. Counsel for putative father stated he had been unable to get in touch with putative father for the past two days and did not have an explanation for putative father's absence, but he asked the trial court for a continuance of two weeks to secure putative father's presence at the trial. Counsel for FCCS argued against the continuance motion, noting J.J. had spent his entire life in foster care, that putative father had not engaged in services, and expressed doubt that putative father would attend a continued trial date as putative father also failed to appear at the pre-trial conference. The trial court denied the continuance request and proceeded with the trial.

{¶ 8} Mother did not appear at the trial and did not contest the grant of permanent custody to FCCS. Two witnesses gave testimony during the trial: the FCCS caseworker and the guardian ad litem. Caitlin Cahoon, the FCCS caseworker employed by Permanent Family Solutions Network, testified she was assigned to J.J.'s case in August 2019. Cahoon testified that mother did not contest the PCC motion but was engaged in services and had been doing well. Additionally, Cahoon stated mother would like J.J. to be adopted by his current foster caregivers and that the foster parents were comfortable allowing mother to have visitation with J.J. if they were to adopt J.J.

{¶ 9} As to putative father, Cahoon testified that although putative father had been identified as an alleged father, as of the date of trial he had yet to take any steps to establish paternity. Though Cahoon initially believed putative father to be incarcerated when she first received the case in August 2019, she testified that through her work on the case she learned that putative father had been released in July 2019. After multiple attempts to locate putative father at his reported address, Cahoon said she eventually learned putative father was living with his father. Cahoon stated she was ultimately able to make phone contact with putative father and spoke to him at a January 2020 hearing. Cahoon testified that putative father told her he intended to contest the PCC motion, and Cahoon informed

putative father she would help him obtain a paternity test. When Cahoon told putative father he would need to complete random drug screens in order to participate in the case, putative father told her he was not willing to complete a drug screen that day. When she met putative father in January 2020, Cahoon said she was made aware that he had been in an automobile accident in November 2019 in which he sustained significant injuries requiring the use of a wheelchair for some time.

{¶ 10} In February 2020, Cahoon said she left information about paternity testing at the home of putative father's sister, and she said she also attempted to visit putative father in April 2020. The next time Cahoon was able to make contact with putative father was in May 2020. At that time, Cahoon said putative father's injuries seemed to have improved since January, though putative father reported to her that he was not yet fully recovered and still required assistance for certain daily tasks. Cahoon testified that putative father told her that he had contacted North Central Mental Health ("NCMH") but had yet to complete the assessment. Cahoon provided putative father another referral to NCMH and again told him that he would need to participate in the drug screens, establish paternity, and follow up on the referral to NCMH. The May 2020 meeting was the last time Cahoon had any contact with putative father, and Cahoon was unable to successfully locate putative father again despite conducting absent parent searches on a regular basis. Cahoon testified that, to her knowledge, putative father had never visited with or even met J.J.

{¶ 11} Cahoon additionally testified she had visited J.J.'s foster home and that it was an appropriate environment for J.J. Cahoon described J.J. as extremely bonded to his foster caregivers, having been in their continuous care since his birth. J.J. refers to his caregivers as mom and dad, and Cahoon testified the foster parents are interested in adopting J.J. Ultimately, Cahoon testified it was her recommendation that the trial court grant the PCC motion for purposes of adoption.

{¶ 12} The second and final witness at the trial was Anna Schroeder, J.J.'s guardian ad litem. Schroeder testified she was appointed to the case in July 2018 and had completed a total of 36 visits with J.J., including visits to his foster home, virtual visits via Facetime or videoconferencing, and visits with mother. Additionally, Schroeder stated she reviewed J.J.'s records and kept in regular contact with the caseworkers and caregivers involved in

the case. Schroeder testified she believed J.J. was very bonded to his foster caregivers, and it was her recommendation that the trial court grant the PCC motion.

{¶ 13} At the conclusion of evidence, counsel for putative father renewed his request for a continuance. The trial court again denied the continuance, noting every opportunity was made to include putative father in the proceedings, the trial date was known to putative father, and that putative father was represented by counsel.

{¶ 14} On March 19, 2021, more than two months after the trial date, the trial court issued a decision and judgment entry granting the PCC motion and placing J.J. in the permanent custody of FCCS. Putative father timely appeals.

## II. Assignment of Error

{¶ 15} Putative father assigns the following error for our review:

> The trial court abused its discretion and committed reversible error by denying the appellant's request for a reasonable continuance in violation of his Due Process rights guaranteed by the United States and Ohio Constitutions.

## III. Analysis

{¶ 16} In his sole assignment of error, putative father argues the trial court erred when it denied his request for a continuance and proceeded to the permanent custody hearing when he was not present.

{¶ 17} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694, 2000 Ohio App. LEXIS 4550 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 18} A trial court may grant permanent custody if it determines by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), " 'such relief is in the best interest of the child.' " *In re G.E.H.*, 10th Dist. No. 15AP-966, 2016-Ohio-3535, ¶ 52, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9. On appeal, we will not reverse a trial court's decision in a permanent custody case unless it is against the manifest weight of the evidence. *In re I.R.*, 10th Dist. No. 04AP-1296, 2005-Ohio-6622, ¶ 4, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. Judgments in permanent custody proceedings are not against the manifest weight of the evidence "when all material elements are supported by competent, credible evidence." *In re J.T.* at ¶ 8.

{¶ 19} Putative father, however, does not argue that the trial court's decision to award permanent custody to FCCS was against the manifest weight of the evidence. Rather, he argues the trial court erred when it failed to grant his requested continuance and proceeded to trial in his absence.

{¶ 20} An appellate court will not reverse a denial of a continuance in a PCC case absent an abuse of discretion. *In re J.B.*, 10th Dist. No. 08AP-1108, 2009-Ohio-3083, ¶ 26, citing *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 23. An abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Further, " '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *In re J.B.* at ¶ 26, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 21} In reviewing whether a trial court abused its discretion in denying a continuance, an appellate court weighs any potential prejudice to the movant against the court's right to control its docket and the public's interest in the efficient dispatch of justice. *State v. Woods*, 10th Dist. No. 09AP-667, 2010-Ohio-1586, ¶ 24; *In re M.K.*, 10th Dist. No. 09AP-1141, 2010-Ohio-2194, ¶ 14. In evaluating a request for a continuance, a court considers (1) the length of the requested delay; (2) whether the parties have requested and received other continuances; (3) the inconvenience to the parties, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived; (5) whether the movant contributed to the circumstances

giving rise to the request for a continuance; and (6) any other relevant factors, depending on the unique circumstances of each case. *Woods* at ¶ 24, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981); *In re J.B.* at ¶ 26.

{¶ 22} Considering all the circumstances surrounding putative father's request for a continuance, we conclude the trial court did not abuse its discretion in denying his oral motion for a continuance on the day of the trial. When putative father failed to appear for trial, counsel for putative father stated he had been unable to make contact with putative father in the days leading up to the trial and did not know putative father's whereabouts or reason for not attending. *See In re A.P.*, 10th Dist. No. 08AP-186, 2009-Ohio-438, ¶ 5-6 (trial court did not abuse its discretion in denying request for continuance where the request is made the day of the hearing after parent failed to appear and counsel is unable to give a reason for the parent's absence or explain the parent's whereabouts). Pursuant to R.C. 2151.414(A)(2), the trial court is to hold the PCC hearing no later than 120 days after the agency files the PCC motion except for "good cause" shown for a reasonable continuance. By the time of the January 7, 2021 trial date, the PCC motion had been pending for more than 390 days. *See In re J.C.*, 10th Dist. No. 10AP-766, 2011-Ohio-715, ¶ 46 (a trial court does not abuse its discretion in denying a request for a continuance when the PCC hearing is already past the 120-day deadline contained in R.C. 2151.414(A)(2)). Moreover, by the time of the PCC hearing, J.J. had been in FCCS's custody for more than two and one-half years, and he had the potential for an adoptive placement with his current foster caregivers. *See In re J.M.*, 10th Dist. No. 15AP-234, 2015-Ohio-3988, ¶ 26 (a trial court may consider the children's length of time in foster care and potential for adoptive placement as a relevant factor in determining whether to grant or deny a continuance).

{¶ 23} To the extent putative father now suggests that the reason he was unavailable for trial was that he was ill or injured, we note that this court has found that a trial court does not abuse its discretion in denying a continuance in a PCC case based on unverified claims of medical or health issues. *See In re K.J.*, 10th Dist. No. 17AP-457, 2018-Ohio-471, ¶ 19-20 (trial court did not abuse its discretion in denying mother's request for a continuance on the stated basis of a "medical emergency" where mother had a history of using unverified claims of medical or health issues as a reason for her failure to appear at prior hearings). Here, putative father did not represent to the trial court that his injuries

from his 2019 accident would interfere with his ability to attend the PCC hearing or that some other medical or health condition would preclude his attendance; instead, he simply did not appear and his counsel could not make contact with him. We further note that two months elapsed between the trial date and the date the trial court issued its decision and entry granting the PCC motion, yet in that time putative father did not come forward with any explanation for his failure to attend to the PCC hearing. Putative father's suggestion that his injuries may have impacted his participation in the case, made for the first time on appeal, does not render the trial court's denial of his request for a continuance an abuse of discretion. *See In re B.M.*, 10th Dist. No. 09AP-60, 2009-Ohio-4846, ¶ 23-24 (no abuse of discretion in denying continuance based on a claim that mother may have been in the emergency room where mother's visit to the hospital could not be verified and mother failed to follow up with her attorney).

{¶ 24} Further, we are mindful that putative father makes no argument that a delay in proceedings either would have ensured his attendance at a subsequent trial date or that he would have offered any additional testimony or evidence that would have had an impact on the trial court's ultimate decision regarding permanent custody. This court has affirmed the denial of a continuance in a permanent custody case where the parent makes no showing that granting the continuance likely would have changed the outcome of the case. *In re K.J.* at ¶ 22-23 ("mother still does not explain her failure to make any substantial progress toward reunification with her children during the more than two years that the case had been open with FCCS," and "even if mother had been able to testify to newly revealed progress on her case plan, it is unlikely that such information would have changed the outcome of the case"), citing *In re B.G.W.* at ¶ 27 (no abuse of discretion in granting continuance where the continuance likely would not have changed the outcome of the case); *In re A.P.* at ¶ 6 (no abuse of discretion in denying continuance request where mother made no attempts to contact the court or her counsel to explain her whereabouts and did not show that a continuance would have "remedied the many ways appellant failed to comply with even the basics of the case plan filed by FCCS"). Both the FCCS caseworker and J.J.'s guardian ad litem recommended the court grant FCCS's motion for permanent custody. Putative father has never met J.J., did not meaningfully engage in services, and did not establish actual paternity despite J.J. being in foster care for more than two and one-half

years by the time of the permanent custody hearing. *See In re K.J.* at ¶ 30 (father had lost contact with the children, was represented by counsel throughout the proceedings, and did not indicate how the proceedings might have changed had he been present), citing *In re M.M.*, 4th Dist. No. 14CA6, 2014-Ohio-5111, ¶ 51 (trial court did not deprive parent of her due process right to a fundamental fair permanent custody hearing when it proceeded in her absence while she was incarcerated because "[c]ounsel meaningfully represented appellant at the hearing, a complete record was made, and appellant has failed to show what additional testimony or evidence she would have offered that would have changed the outcome of the case"); *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 44 (father's lack of contact with the children meant there was little risk of error in proceeding with the hearing in father's absence). These circumstances demonstrate the trial court did not abuse its discretion in denying the continuance.

{¶ 25} Having reviewed the record and considered the *Unger* factors outlined above, we conclude the trial court did not abuse its discretion in denying putative father's motion for continuance. We overrule putative father's sole assignment of error.

## IV. Disposition

{¶ 26} Based on the foregoing reasons, the trial court did not abuse its discretion in denying putative father's motion for a continuance. Having overruled putative father's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

JAMISON and NELSON, JJ., concur.

NELSON, J., retired, formerly of the Tenth Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).

_____