[Cite as *In re R.S.*, 2026-Ohio-731.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: | : | No. 25AP-518 |
| | | (C.P.C. No. 22JU-10646) |
| [R.S., | : | |
| | | (REGULAR CALENDAR) |
| R.Sc., father, Appellant]. | : | |

D E C I S I O N

Rendered on March 5, 2026

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

**On brief:** *William T. Cramer*, for appellant.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations and Juvenile Branch

JAMISON, J.

{¶ 1}     Appellant, R.Sc., father of the minor child, R.S., appeals the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, granting permanent custody of R.S. to Franklin County Children Services ("FCCS"), a public children services agency.  For the reasons below, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}     R.S. was born on or about March 29, 2011.

{¶ 3}     This matter originated in the Common Pleas Court of Clark County, Ohio, Domestic Relations Division, Juvenile Section after Clark County Department of Job and Family Services ("CCDJFS") filed a complaint on March 25, 2022, alleging that R.S. was a dependent and neglected child.

{¶ 4}     The complaint alleged that in February 2022, appellant was in the hospital in need of major cervical surgery.  R.S. was living with him in the hospital because they had no place to stay and appellant could not find a placement for R.S.  Appellant left the hospital

against medical advice and walked to a hotel with R.S. On February 15, 2022, the Springfield Police Department removed R.S. from appellant's care. R.S. was placed with her sister, J.L., who resided in Columbus. Appellant was subsequently charged with endangering children due to educational and medical neglect. Despite having special needs, R.S. was not enrolled in school and had not recently seen a medical provider, other than a dentist. It should also be noted that R.S.'s mother was deceased.

{¶ 5} Following a shelter care hearing, R.S. was placed in the interim temporary custody of CCDJFS. Prior to the adjudication and disposition hearings, J.L. filed a motion for legal custody of R.S. Subsequently, by agreement of the parties, R.S. was adjudicated dependent and placed in the temporary legal custody of J.L. The allegation of neglect was dismissed.

{¶ 6} In September of 2022, CCDJFS motioned the court to transfer this matter to Franklin County Juvenile Court. That motion was granted.

{¶ 7} Kelley Boller was appointed to serve as R.S.'s guardian ad litem ("GAL").

{¶ 8} J.L. again filed for legal custody.

{¶ 9} Boller filed a GAL report on February 23, 2023. Boller noted that R.S. seemed content living with J.L. R.S. had a "sibling-like" relationship with J.L.'s children. (Feb. 23, 2023 Report of GAL at 2.) Due to the age difference, R.S.'s relationship with J.L. was more like mother/daughter, as opposed to siblings. It was noted that while she lived with appellant, R.S. missed a lot of school and her special needs were not met. Appellant was a truck driver. He and R.S. traveled, living out of his truck. Ultimately, Boller recommended that the trial court grant J.L.'s motion for legal custody.

{¶ 10} Another GAL report was filed on January 2, 2024. In that report, Boller noted that appellant indicated he wanted custody of R.S., but she had doubts about his sincerity. It was alleged that appellant made little progress on his case plan. As for R.S.'s wishes, Boller stated that R.S. went back and forth about wanting to be reunited with appellant. It was again recommended that the trial court grant J.L.'s motion for legal custody.

{¶ 11} On March 26, 2024, J.L. voluntarily dismissed her motion for legal custody.

{¶ 12} On April 23, 2024, FCCS filed a motion for shelter care and alternative disposition. In that motion, FCCS alleged that J.L. contacted the caseworker on March 8,

2024, indicating that she could no longer maintain R.S. in her home. R.S. was removed and placed at Huckleberry House, a residential treatment facility. J.L. signed an agreement for temporary custody, which was set to expire on April 24, 2024. Because R.S. could not be returned to appellant, FCCS requested temporary custody.

{¶ 13} Following a hearing on May 3, 2024, FCCS's motion was dismissed due to lack of service. However, the trial court ordered that R.S. be placed in the temporary custody of FCCS.

{¶ 14} On August 15, 2024, FCCS filed a motion for permanent custody of R.S.

{¶ 15} On September 30, 2024, R.S. was placed in New Life Group Home, a qualified residential treatment program.

{¶ 16} Prior to the hearing, Boller filed another report and recommendation. She noted that appellant made minimal progress on his case plan. As for R.S.'s wishes, R.S. was recently more consistent about not wanting to be reunified with appellant. In the year preceding this report, appellant only saw R.S. in person a "handful of times." (Feb. 12, 2025 Report of GAL at 3.) Appellant refused to disclose in what state he was currently living. Ultimately, Boller recommended that the trial court grant FCCS's motion for permanent custody.

{¶ 17} The hearing on FCCS's motion for permanent custody was held on June 11, 2025. Prior to the start of the hearing, counsel for appellant requested a continuance. Appellant was unable to appear at the hearing due to work. Appellant requested the continuance for two reasons. First, he was now supportive of J.L. having legal custody of R.S. Second, even if J.L. was unwilling to take legal custody of R.S., appellant alleged that he was recently granted disability. Thus, he would be able to quit his job as a long-haul truck driver, find housing, and be able to provide for R.S.'s needs. The attorney for R.S. was in support of the continuance because R.S. had recently changed her position and now wanted to reunify with appellant. FCCS opposed the continuance. The GAL opposed the continuance citing the emotional toll each continuance took on R.S. The trial court denied the request.

{¶ 18} Sarah Hogan testified that she was FCCS's ongoing caseworker for R.S. Hogan testified that R.S. had not been in appellant's custody since March of 2022. At that time, R.S. was placed into the temporary custody of CCDJFS due to appellant not having

stable housing, not ensuring that R.S. was attending school, and not meeting her basic medical needs. She was in the custody of J.L. from July 2022 until March 2024. In March of 2024, J.L. indicated she could no longer have R.S. in her home. R.S. came into FCCS's custody and was placed in a group home. At the time of the hearing, R.S. was placed in the New Life Group Home.

{¶ 19} Hogan testified that appellant had the following case plan objectives: ensure that R.S.'s immediate and basic needs were met, attend all medical appointments, complete a mental health assessment and follow all recommendations, complete a drug and alcohol assessment and follow all recommendations, complete random drug screens, obtain safe and suitable housing, address any criminal charges and not have any further criminal charges, attend supervised visits, work with a parent mentor, sign releases of information, and meet monthly with FCCS.

{¶ 20} Appellant was employed out-of-state as a driver of a commercial-sized dump truck. For a while, he was in Connecticut but, as of the date of the hearing, appellant refused to provide FCCS with an address or state of his residence. Hogan offered to link appellant to a community service worker to help him look for housing. She requested that he provide her with paystubs to get the process started, but he refused. According to Hogan, appellant was living in hotels at the location of whatever project on which he was working. Appellant's boss paid for the rooms, and he typically stayed with another crewmember.

{¶ 21} At the beginning of the case, Hogan did not have consistent contact with appellant. However, in the year preceding the hearing, appellant maintained consistent contact with her via telephone and video calls. Hogan indicated that she had a good working relationship with appellant, and he was actively involved in their conversations about R.S.

{¶ 22} Appellant signed releases of information.

{¶ 23} Appellant completed a mental health assessment through Ohio Guidestone. He was diagnosed with adjustment disorder with depressive mood. He was recommended to attend weekly therapy appointments and consult with psychiatry. Hogan testified that appellant had not had any recent contact with Ohio Guidestone but was unsure of appellant's status because she did not have an updated release of information.

{¶ 24} Appellant did not complete an alcohol and drug assessment. He self-reported that it was unnecessary because he did not have a drug or alcohol issue. He also did not complete drug screens for FCCS. Hogan asked for him to complete drug screens when he appeared for hearings, but he did not complete them. FCCS had concerns for drug use because there were indications in the family's records that appellant had a history of cocaine use.

{¶ 25} At the time of the hearing, appellant was not on probation and had no pending criminal charges.

{¶ 26} Appellant was linked with a parent mentor from Ohio Guidestone. However, this was terminated due to non-engagement. Appellant was working out-of-state and was no longer making frequent trips back to Ohio.

{¶ 27} As for R.S.'s progress, Hogan testified that she showed great progress academically. R.S. was diagnosed with Autism with speech impairment, Attention Deficit/Hyperactivity Disorder, and other trauma-specified disorder. R.S. had an Individualized Education Plan ("IEP") and her schooling involved collaboration between the school, her placement, FCCS, and J.L. Appellant did not attend her IEP and other school meetings. Hogan had concerns that if R.S. was returned to appellant, her academics would suffer greatly. R.S. needed a stable environment and the father's work situation would not allow for that.

{¶ 28} Appellant also did not attend any of R.S.'s medical appointments. Due to her diagnoses, R.S. required a lot of services. Although appellant was aware of those services, he had not yet taken part in those services.

{¶ 29} Hogan testified that R.S. was adamant that she wanted to remain at her group home. R.S. made a friend at the group home and had a strong relationship with its director. R.S. was very comfortable there, and given her fear of change and new people, it would be emotionally damaging if she was removed from that placement. Hogan also testified that even if FCCS was granted permanent custody, it would continue to encourage J.L. and R.S. to develop their relationship. FCCS would even allow contact with appellant at R.S.'s discretion, as long as it was appropriate.

{¶ 30} When appellant was in Ohio, he was sporadically exercising in-person visits with R.S. However, once he began working out-of-state, he consistently had video visits

with R.S. He had two in-person visits in the year preceding the hearing. In the months leading up to the hearing, R.S. was refusing to speak with appellant.

{¶ 31} On cross-examination, Hogan testified that she saw progress from appellant and she believed that he truly cared for R.S. The week before the hearing, appellant called her and told her that his claim for disability was granted. He indicated that he was going to get a check for the past six years. However, he did not know when the check would arrive or the amount.

{¶ 32} Boller testified that she had the same concerns that she had at the beginning of the case. Appellant still did not have a stable place to live. She testified that she believed that if R.S. was returned to appellant, she would backslide medically and academically. In Boller's opinion, it would be devastating for R.S. to leave her current placement. Boller observed an in-person visit between R.S. and appellant. She noted in her report that their relationship seemed to be more like a girlfriend-boyfriend rather than a father-daughter. For the entire visit, appellant had one arm around R.S. and the other holding R.S.'s hand. Anytime she moved, he would move with her. Boller testified that, in retrospect, she may have been too harsh with her characterization of their relationship. However, she still believed that what she observed demonstrated both R.S.'s and appellant's mental health issues. Those gave her concerns for appellant's ability to appropriately care for R.S.

{¶ 33} On June 20, 2025, the trial court issued a written decision and judgment entry. First, it stated its reasons for denying appellant's request for a continuance. The trial court articulated six reasons for why it was denying appellant's request. First, the permanent custody motion had been pending for ten months. R.S. had been out of appellant's care for over three years, and the child needed permanency. Second, the case was previously continued several times. Third, appellant was represented by counsel at every stage of the proceedings. Fourth, appellant's absence was due to his refusal to take time off from work. He knew the date was pending for months but waited until the last possible minute to ask for a continuance. The trial court indicated it would have provided him a work excuse or would have allowed him to appear via video conferencing. Fifth, another continuance would have caused inconvenience to the other parties and to the trial court. Last, the testimony established appellant's lack of progress on his case plan and there

was no guarantee he would have appeared even if the trial court had granted the continuance. Ultimately, the trial court granted FCCS's motion for permanent custody.

{¶ 34} It is from that decision that appellant now brings this appeal.

## II. ASSIGNMENT OF ERROR

{¶ 35} Appellant assigns the following as trial court error:

> Appellant's right to Due Process was violated by the denial of a continuance that was necessary to enable appellant to attend the permanent custody hearing and provide vital testimony.

## III. STANDARD OF REVIEW

{¶ 36} Per Juv.R. 23 "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." A decision to grant or deny a request for a continuance is entrusted to the broad, sound discretion of the trial court. *State v. Ungar*, 67 Ohio St.2d 65, 67 (1981). An appellate court must not reverse a denial of a continuance unless the trial court abused its discretion. *Id.* An abuse of discretion exists when the trial court has an unreasonable, arbitrary, or unconscionable attitude in reaching its decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "In determining whether the trial court abused its discretion we weigh the potential prejudice to the movant against the trial court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *In re M.K.*, 2010-Ohio-2194, ¶ 14 (10th Dist.).

{¶ 37} " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *In re J.B.*, 2009-Ohio-3083, ¶ 26 (10th Dist.), quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). In evaluating a request for a continuance, a court considers: (1) the length of the requested delay, (2) whether there have been previous continuances, (3) the inconvenience to the parties involved, (4) whether the request is for a legitimate reason, (5) whether the requester contributed to the need for a continuance, and (6) any other relevant factors. *In re C.W.*, 2025-Ohio-282, ¶ 50 (10th Dist.).

## IV. LEGAL ANALYSIS

{¶ 38} In his sole assignment of error, appellant contends that the trial court erred in denying his motion to continue the permanent custody hearing. More specifically,

appellant alleges that a continuance was necessary to secure his presence at the hearing and allow him to testify. He contends that if he was allowed to testify, he would be able to provide information and context on his relationship with R.S., his efforts towards reunification, and his recently approved disability claim. Appellant asserts that a continuance would have allowed him to collect on his disability claim and obtain suitable housing for him and R.S. However, considering the totality of the circumstances surrounding appellant's request for a continuance, we conclude that the trial court did not abuse its discretion in denying his request.

{¶ 39} Pursuant to R.C. 2151.414(A)(2), the trial court is to hold a hearing on a motion for permanent custody no later than 120 days after the public children services agency files said motion. Generally, a trial court does not abuse its discretion in denying a request for a continuance when the permanent custody hearing is already past the aforementioned deadline. *In re J.C.*, 2011-Ohio-715, ¶ 46 (10th Dist.); *see also In re J.J.*, 2022-Ohio-907, ¶ 22 (10th Dist.). In this matter, FCCS's permanent custody motion had been pending for approximately 300 days. Moreover, at the time of the hearing, R.S. had been in FCCS's custody for over one year, and out of appellant's custody for over three years. In expressing her opposition to the continuance, Boller believed that each time the matter got continued it took an emotional toll on R.S.

{¶ 40} Additionally, "[t]his court has affirmed the denial of a continuance in a permanent custody case where the parent makes no showing that granting the continuance likely would have changed the outcome of the case." *In re J.J.* at ¶ 24; *see also In re K.J.*, 2018-Ohio-471, ¶ 22-23 (10th Dist.); *In re B.G.W.*, 2008-Ohio-3693, ¶ 27 (10th Dist.). In this case, the record establishes that appellant made minimal progress on his case plan. He failed to obtain safe and suitable housing. In fact, appellant refused to tell FCCS where he was residing and refused to provide the information necessary to allow FCCS to help him find housing. He failed to follow through with any recommendations of the requested assessments. Although he consistently had phone contact with R.S., he only had two in-person visits with her. While his lack of progress appears to mostly be a result of his out-of-state employment, the court fails to see how his permanent relocation to the area would all of a sudden guarantee that he would be able to meet R.S.'s needs. This is especially so

considering R.S. was removed from his custody due, in part, to his failure to provide for her educational and medical needs.

{¶ 41} R.S. is a child with significant special needs. While appellant was aware of these needs, he had not participated in any of the services required to meet those needs. While appellant contends he would have been able to testify about his recent disability approval, the trial court already heard testimony about this through the caseworker and Boller. Thus, this potential testimony supporting his argument on appeal would have been duplicative at best. Furthermore, any testimony regarding his disability income and ability to obtain stable housing was speculative. As of the week before the hearing, appellant was unaware of the amount he would be receiving or when he would be receiving it. It follows that even if the trial court granted appellant's continuance request *and* appellant appeared, it is unlikely that the outcome would have changed.

{¶ 42} In sum, a review of the circumstances surrounding the request for the continuance reveals that the need to efficiently dispense with this matter substantially outweighed any potential prejudice. The matter was continued on several previous occasions. Appellant did not offer a definite date or time period when he would be available. In fact, months earlier, appellant was present and able to provide his input when this hearing date was set. In its decision, the trial court even indicated that it was amenable to allowing appellant to appear via video conferencing, something that appellant had plenty of time to request. Thus, it cannot be concluded that the trial court abused its discretion in denying appellant's last-minute request for a continuance.

{¶ 43} Appellant's sole assignment of error is overruled

## V. CONCLUSION

{¶ 44} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and LELAND, JJ., concur.

_____