[Cite as *In re A.S.*, 2026-Ohio-1292.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 25AP-582 |
| A.S. | : | (C.P.C. No. 23JU-10785) |
| (L.S., Mother, | : | (REGULAR CALENDAR) |
| Appellant). | : | |
| | : | |

D E C I S I O N

Rendered on April 9, 2026

**On brief:** *Jonathan W. Klein*, for appellant.

**On brief:** *Robert J. McClaren* for Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1} Appellant, L.S., mother of A.S., appeals from a decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and placing A.S. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} This case involves FCCS's request for permanent custody of A.S., who was born on April 14, 2022. FCCS filed a complaint on October 26, 2023 alleging A.S. to be a

dependent child.  The October 26, 2023 complaint was the third refiling of the complaint. FCCS stated in the complaint that the matter was first referred to FCCS in October 2022 after it was reported mother had been sexually assaulted by the child's father, J.P-V., while A.S. was present.  On another occasion in January 2023, FCCS received a report that mother was held at gunpoint and raped, again in the presence of the child.  Following that incident, mother reportedly ingested a large quantity of medication.  FCCS performed a well check, and mother was transported to the hospital.  Mother indicated she did not have family or friends to care for the child in the event of hospitalization, and mother did not respond to FCCS's multiple attempts to conduct a home visit.  The complaint also stated mother has a history of opioid and marijuana use.

{¶ 3}  On March 6, 2023, FCCS received a temporary order of custody ("TOC"). FCCS placed A.S. in kinship care while mother received in-patient mental health treatment. When mother was discharged from in-patient treatment in May 2023, it was recommended she engage in intensive outpatient programming.  Mother was linked with this programming but stopped attending in June 2023 and, at the time of the complaint, was not engaged with any known mental health services.  The complaint stated mother relocated several times and had completed only two urine screens since August 2023, both of which were negative.

{¶ 4}  The trial court issued a TOC to FCCS on October 27, 2023.  Subsequently, on December 11, 2023, the trial court adjudicated A.S. a dependent child and awarded temporary court commitment to FCCS.  Thereafter, the trial court approved and adopted a case plan for mother and father.

{¶ 5}  Following an extension of temporary court commitment in March 2024, FCCS filed a motion for permanent court commitment ("PCC") of A.S. on August 2, 2024. The trial court granted several continuances of the PCC proceedings.  First, on September 5, 2024, the trial court granted FCCS's motion for a continuance to perfect service on father, who was to have no contact with A.S. until he made himself available to the court.  The trial court granted FCCS a second continuance on October 9, 2024, again to perfect service on father.  On November 19, 2024, the trial court granted mother's motion for a continuance based on mother's opposition to the PCC motion.  On January 6, 2025, the trial court

continued the PCC motion for a fourth time because the court was closed due to inclement weather.

{¶ 6} Ultimately, the matter came for trial on March 3, 2025. Father did not contest the PCC motion. At the start of trial, Helena D'Arms, substitute counsel for mother, moved for a continuance. (Mar. 3, 2025 Tr. at 6-8.) Ms. D'Arms indicated she was covering for mother's assigned counsel, Robert Nekervis, and both she and Mr. Nekervis, who was on vacation, had not realized the hearing would actually be the trial date. (Mar. 3, 2025 Tr. at 6.) The trial court noted the docket indicated March 3, 2025 was both a pre-trial and the trial date. (Mar. 3, 2025 Tr. at 5-6.) Ms. D'Arms stated she had only started to review the case file that day and was "unprepared" to go to trial. (Mar. 3, 2025 Tr. at 6-7.) Ms. D'Arms asked the trial court to "consider a continuance for [assigned counsel] to be present." (Mar. 3, 2025 Tr. at 7-8.) The trial court declined to rule on the continuance request immediately, opting instead to hear testimony from the FCCS caseworker and the guardian ad litem. (Mar. 3, 2025 Tr. at 8.) The trial court stated, "[I]f there's something different that comes out that would -- that would show recent positive efforts towards reunification, then I would grant [the continuance], but if it -- what's in the [guardian ad litem's] report, I -- I'm not gonna (sic) grant it." (Mar. 3, 2025 Tr. at 8.)

{¶ 7} The trial court then heard testimony from the FCCS caseworker. (Mar. 3, 2025 Tr. at 12.) Emily Morgan, the ongoing caseworker assigned to the matter, testified that A.S. was two years old at the time of trial. (Mar. 3, 2025 Tr. at 13.) Ms. Morgan testified FCCS became involved with A.S. in January 2023 after a report that mother had been robbed and raped at gunpoint while A.S. was present. (Mar. 3, 2025 Tr. at 14.) After mother attempted self-harm by ingesting medication, FCCS obtained a TOC in March 2023. (Mar. 3, 2025 Tr. at 14.) The agency obtained temporary court commitment of A.S. on December 11, 2023. (Mar. 3, 2025 Tr. at 14.)

{¶ 8} Ms. Morgan testified A.S. is in an approved kinship home and has been in the same placement since March 2023. (Mar. 3, 2025 Tr. at 15.) The kinship home is a potential adoptive placement. (Mar. 3, 2025 Tr. at 15.) Ms. Morgan described A.S. as "very bonded" with the kinship caregivers, testifying A.S. "appears happy and well cared for" and refers to the kinship caregivers "as mom and dad." (Mar. 3, 2025 Tr. at 16.)

**{¶ 9}** Ms. Morgan described mother's case plan requirements, including (1) completing a psychological evaluation and following any recommendations; (2) complying with random drug screens; (3) completing an alcohol and drug assessment; (4) completing parenting classes; (5) completing a domestic violence victim's assessment and refraining from relationships involving domestic violence; (6) engaging with a community service worker through FCCS if referred; (7) linking with a parent mentor if referred; (8) obtaining safe and stable housing; (9) maintaining employment; (10) signing all releases of information; and (11) meeting with the FCCS caseworker at least once a month. (Mar. 3, 2025 Tr. at 16-17.) Ms. Morgan testified she went over the case plan requirements with mother, and she said mother seemed to understand what was required of her. (Mar. 3, 2025 Tr. at 16.)

**{¶ 10}** Mother completed a psychological assessment, and it was recommended she stabilize her mental health by engaging in consistent mental health treatment and medication management and obtaining safe and stable housing. (Mar. 3, 2025 Tr. at 17-18.) Ms. Morgan testified mother was linked with between five and ten different mental health providers but has not engaged in consistent treatment. (Mar. 3, 2025 Tr. at 18-19.) Additionally, mother had been hospitalized "about five times" since Ms. Morgan became involved with this case. (Mar. 3, 2025 Tr. at 18.) Ms. Morgan said she had not had any contact with mother since August 2024, and mother had not maintained her once-a-month visit for seven consecutive months. (Mar. 3, 2025 Tr. at 19.)

**{¶ 11}** Mother completed 11 drug screens, all of which were negative. (Mar. 3, 2025 Tr. at 19-20.) However, Ms. Morgan testified mother had missed over 20 drug screens and had not completed any drug screens since December 2023. (Mar. 3, 2025 Tr. at 20.) Ms. Morgan testified she made efforts to help mother attend drug screens, including providing bus passes or arranging taxi cabs from her residence to the location of the screens, but mother did not utilize those resources. (Mar. 3, 2025 Tr. at 20.) Mother did complete an alcohol and drug assessment that resulted in mother's admission in an intensive in-patient program for concerns of opiate use relapse, but mother voluntarily left that program early against medical advice. (Mar. 3, 2025 Tr. at 20.)

**{¶ 12}** Ms. Morgan testified mother had not completed any parenting classes despite Ms. Morgan's efforts to help her attend parenting classes. (Mar. 3, 2025 Tr. at 21.)

Additionally, mother did not complete a formal domestic violence victim's assessment, though Ms. Morgan testified mother did engage with a domestic violence course but opted not to link with any supportive services. (Mar. 3, 2025 Tr. at 22.) Mother engaged with the community service worker for assistance with hygiene items, housing resources, and transportation. (Mar. 3, 2025 Tr. at 22-23.) Mother also engaged with a parent mentor through Ohio Guidestone in May 2024 but declined a separate parent partner program. (Mar. 3, 2025 Tr. at 23.)

{¶ 13} Ms. Morgan testified mother did not have stable housing at the time of trial, noting mother reported she was living with a friend. (Mar. 3, 2025 Tr. at 24.) Ms. Morgan said mother has provided 11 different addresses to FCCS and has not had stable housing for the duration of the case. (Mar. 3, 2025 Tr. at 24.) Of the three addresses Ms. Morgan was able to visit, none were appropriate for a child. (Mar. 3, 2025 Tr. at 25.) Ms. Morgan testified mother was not currently employed and had never verified any employment throughout the case. (Mar. 3, 2025 Tr. at 25.)

{¶ 14} Ms. Morgan said mother maintained consistent contact with her from the time the case was opened until August 2024. (Mar. 3, 2025 Tr. at 26.) Ms. Morgan had not had any contact with mother from August 2024 until the date of trial despite sending her monthly appointment letters and attempting to make phone contact with her. (Mar. 3, 2025 Tr. at 26-27.) In total, Ms. Morgan said mother attended approximately 50 visits with A.S. and missed approximately 30 visits. (Mar. 3, 2025 Tr. at 29.) Mother's last formal visit with A.S. was at the agency offices in August 2024. (Mar. 3, 2025 Tr. at 29.) Ms. Morgan testified mother "reached out to [her] several times throughout August that [mother] did not feel she wanted to continue engaging with the Agency to include visiting with [A.S.] and that she no longer wished to work her case plan." (Mar. 3, 2025 Tr. at 29.) Although mother's agency visitations ceased in August 2024, Ms. Morgan testified mother had two additional visits with A.S.—one in December 2024 and another in January or February 2025—that mother had arranged with the kinship caregiver. (Mar. 3, 2025 Tr. at 29-30.)

{¶ 15} Ms. Morgan testified the interactions between mother and A.S. "varied," explaining that mother would sometimes bring additional people to the lobby of the visiting area, making A.S. "visibly uncomfortable" and causing her to "move to go sit with kinship

caregivers until it was time for the visit to start just between" mother and A.S. (Mar. 3, 2025 Tr. at 30.) Ms. Morgan described some visits as "really engaged" and other visits "that weren't as engaged," noting mother would occasionally be on her phone during visits. (Mar. 3, 2025 Tr. at 31.) She also described mother becoming visibly frustrated with A.S.'s behavior during a visit and saying she was "not doing this anymore." (Mar. 3, 2025 Tr. at 31.) Ms. Morgan testified she believes A.S. is bonded to mother. (Mar. 3, 2025 Tr. at 31.)

{¶ 16} Ms. Morgan testified the kinship caregivers are not interested in legal custody because they do not "feel that is the right decision to protect" A.S. (Mar. 3, 2025 Tr. at 32.) However, Ms. Morgan reiterated the kinship caregivers are a prospective adoptive home for A.S. (Mar. 3, 2025 Tr. at 32.) It was Ms. Morgan's opinion that granting the motion for permanent custody was in the best interest of A.S. (Mar. 3, 2025 Tr. at 33.) At the conclusion of Ms. Morgan's direct testimony, the trial court denied mother's request for a continuance and instructed Ms. D'Arms to proceed with cross-examination. (Mar. 3, 2025 Tr. at 34.)

{¶ 17} The child's guardian ad litem, Andrew Yiangou, testified A.S. has a "very strong bond" with the kinship caregivers. (Mar. 3, 2025 Tr. at 52.) He said A.S. is "thriving" in her current placement. (Mar. 3, 2025 Tr. at 52.) Mr. Yiangou described mother as "appropriate" with A.S. during their visits. (Mar. 3, 2025 Tr. at 53.) His biggest concerns with mother were housing instability and mental health, stating mother has had numerous different addresses during the pendency of the case and has not demonstrated that she is following through with recommendations for mental health treatment. (Mar. 3, 2025 Tr. at 53.) Mr. Yiangou testified he has "never had a good phone" number for mother, and he said mother has never reached out to update him on any case plan progress. (Mar. 3, 2025 Tr. at 57.) Mr. Yiangou recommended the trial court grant the PCC motion because it would be in the best interest of A.S. (Mar. 3, 2025 Tr. at 54.) He testified permanent custody was a better option than legal custody under which mother would still be allowed to visit A.S. because mother "hasn't demonstrated a stable lifestyle." (Mar. 3, 2025 Tr. at 64.) The attorney for FCCS informed the trial court that the kinship caregivers were not interested in legal custody. (Mar. 3, 2025 Tr. at 67.)

{¶ 18} V.C., the kinship caregiver for A.S., testified A.S. has lived with her since March 3, 2023, with official placement occurring March 6, 2023. (Mar. 3, 2025 Tr. at 69-

70.) V.C. testified she and A.S. "are very close," and she said A.S. is "also very attached" to V.C.'s husband. (Mar. 3, 2025 Tr. at 71.) V.C. said she maintains a "good" relationship with mother and has arranged for A.S. to see mother three times since formal visitations ceased. (Mar. 3, 2025 Tr. at 72, 74.) V.C. said A.S. takes some time to warm up to visitations with mother but "loves" her and "always will." (Mar. 3, 2025 Tr. at 74.) However, V.C. also said, "[A]t the end of the day [A.S.] is ready to come home with" the kinship caregivers. (Mar. 3, 2025 Tr. at 74.) V.C. said she is not interested in legal custody because it "allow[s] mandated visits," and she has ongoing concerns with mother's stability and communication with father despite a no-contact order. (Mar. 3, 2025 Tr. at 75.) If the agency was granted permanent custody, V.C. testified she would "[a]bsolutely" still allow mother to have supervised visits with A.S. and is a strong proponent of open adoption. (Mar. 3, 2025 Tr. at 78.)

{¶ 19} At the conclusion of V.C.'s direct testimony, the trial court stated it would "take a few weeks break," and reminded mother it was her obligation to demonstrate she has met the case plan objectives. (Mar. 3, 2025 Tr. at 79.) Mother signed a waiver of service and notice of hearing that day. (Mar. 3, 2025 Waiver of Service and Notice of Hearing.)

{¶ 20} Trial resumed on April 3, 2025. Both Ms. D'Arms and Mr. Nekervis appeared as counsel for mother. (Apr. 3, 2025 Tr. at 5.) Mother was not present when the hearing began, and counsel indicated mother had communicated she had overslept and would be late. (Apr. 3, 2025 Tr. at 7-8.) Additionally, counsel for mother stated "we are not asking for [the] return of this child to [mother] at this time." (Apr. 3, 2025 Tr. at 12.) Mother arrived at the hearing approximately one hour after the scheduled start time. (Apr. 3, 2025 Tr. at 16.)

{¶ 21} Ms. D'Arms then conducted the cross-examination of V.C. (Apr. 3, 2025 Tr. at 17.) V.C. testified the current relationship between mother and A.S. was "harmful." (Apr. 3, 2025 Tr. at 19.) V.C. said there has been a "lack of consistency" with mother's visits, and A.S. has developed significant separation anxiety and fear of a caregiver leaving her. (Apr. 3, 2025 Tr. at 19-20.) V.C. said her relationship with mother has deteriorated and she desires permanent custody so mother cannot attempt to return the case to court again in the future. (Apr. 3, 2025 Tr. at 21.) V.C. expressed a desire for A.S. to have permanency and security, and she believed permanent custody would give her a greater ability to protect

A.S. from mother's instability. (Apr. 3, 2025 Tr. at 21-22.) V.C. testified it is difficult to prepare A.S. for mandated visits with mother only for mother not to show up to the visits. (Apr. 3, 2025 Tr. at 22.) V.C. said mother had not reached out to ask about A.S. since the last court hearing. (Apr. 3, 2025 Tr. at 23.) V.C. testified she would be concerned for A.S.'s "general well-being and safety" if she were returned to mother's care. (Apr. 3, 2025 Tr. at 33.)

{¶ 22} Mother, who was 21 years old at the time of trial, testified she spent her own childhood in foster care in both residential and group homes until she aged out of the system. (Apr. 3, 2025 Tr. at 40.) Mother survived numerous instances of sexual assault, violence, and instability in her childhood. (Apr. 3, 2025 Tr. at 41.) She testified she was recently diagnosed with borderline personality disorder. (Apr. 3, 2025 Tr. at 43.) Mother experienced postpartum depression after A.S. was born and had a mental health crisis during which she attempted suicide. (Apr. 3, 2025 Tr. at 47-48.) She said she felt "confused" by what was expected of her under the case plan and expressed the difficulty she felt "trying to support somebody else that is in the system" when she, herself, had spent her "whole life" in the system. (Apr. 3, 2025 Tr. at 50.) Mother testified she was receiving counseling and had a good relationship with her therapist. (Apr. 3, 2025 Tr. at 52.)

{¶ 23} Mother testified she loves A.S. and is "grateful for everything [V.C.] has done for [A.S.] and how [A.S.] feels and how [A.S.] is treated," describing V.C. as "an amazing person." (Apr. 3, 2025 Tr. at 55.) Mother testified she was not attempting to obtain custody of A.S., stating "I know that I cannot do this on my own." (Apr. 3, 2025 Tr. at 56.) She said it was her desire that V.C. obtain legal custody of A.S. so she can maintain contact with A.S. (Apr. 3, 2025 Tr. at 56.) Mother testified she was not in contact with father. (Apr. 3, 2025 Tr. at 61.)

{¶ 24} Mother testified she completed a domestic violence course in March 2024. (Apr. 3, 2025 Tr. at 63.) She also completed a parenting program between the two hearing dates. (Apr. 3, 2025 Tr. at 78.) Mother agreed she asked for visitations with A.S. to stop due to her own mental health, testifying she had been hospitalized for mental health more than ten times since the case opened. (Apr. 3, 2025 Tr. at 66.) She reiterated she wanted V.C. to have custody of A.S., and mother testified she had no plan to regain custody. (Apr. 3, 2025 Tr. at 67.) Mother also testified she has not had a housing lease since the case opened,

has never provided paystubs to either the FCCS caseworker or the guardian ad litem, and has never provided her address to the FCCS caseworker. (Apr. 3, 2025 Tr. at 70-74.)

{¶ 25} Following the hearing, the parties and the guardian ad litem submitted written closing arguments to the court. In a June 11, 2025 decision and judgment entry, the trial court granted the PCC motion, terminated mother's and father's parental rights, and placed A.S. in the permanent custody of FCCS. Mother timely appeals.

## II. Assignments of Error

{¶ 26} Mother raises the following two assignments of error for our review:

[I.] The trial court erred in failing to grant Mother's motion for continuance and that the denial was an abuse of discretion as to violate due process.

[II.] Appellant was prejudicially deprived of her United States and Ohio constitutional rights to a fair trial due to the ineffective assistance of counsel.

## III. Applicable Law

{¶ 27} Parents have a constitutionally protected fundamental interest in the care, custody, and control of their children. *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990) (recognizing the right to raise one's children is a basic and essential civil right). However, these rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979); *In re D.A.*, 2007-Ohio-1105, ¶ 11. In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest. *D.A.* at ¶ 11, citing *Cunningham* at 105. Because termination of parental rights "has been described as 'the family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 28} R.C. 2151.414 governs the termination of parental rights. *In re K.H.*, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that (1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a)

through (e) applies, and (2) it is in the best interest of the child to do so. *In re Z.C.*, 2023-Ohio-4703, ¶ 7. Clear and convincing evidence is the measure or degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence requires more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt as in criminal cases. *Id.*

{¶ 29} To determine the best interest of the child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant facts including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not assign any one factor "greater weight than the others." *In re Schaefer*, 2006-Ohio-5513, ¶ 56.

## IV. First Assignment of Error—Continuance

{¶ 30}  In her first assignment of error, mother argues the trial court erred when it failed to grant her request for a continuance on the first day of trial.

{¶ 31}  An appellate court will not reverse a denial of a continuance in a permanent custody case unless the trial court abused its discretion in denying the continuance.  *In re J.R.*, 2024-Ohio-5619, ¶ 6 (10th Dist.), citing *In re J.B.*, 2009-Ohio-3083, ¶ 26 (10th Dist.), citing *In re B.G.W.*, 2008-Ohio-3693, ¶ 23 (10th Dist.).  An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State ex rel. Deblase v. Ohio Ballot Bd.*, 2023-Ohio-1823, ¶ 27.  In reviewing a trial court's denial of a continuance, "an appellate court weighs any potential prejudice to the movant against the court's right to control its docket and the public's interest in the efficient dispatch of justice."  *J.R.* at ¶ 6, citing *State v. Woods*, 2010-Ohio-1586, ¶ 24 (10th Dist.) and *In re M.K.*, 2010-Ohio-2194, ¶ 14 (10th Dist.).  Further, " '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' "  *J.B.* at ¶ 26, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 32}  In evaluating a request for a continuance, a court considers: (1) the length of the requested delay; (2) whether the parties have requested and received other continuances; (3) the inconvenience to the parties, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived; (5) whether the movant contributed to the circumstances giving rise to the request for a continuance; and (6) any other relevant factors, depending on the unique circumstances of each case.  *J.R.* at ¶ 7, citing *Woods* at ¶ 24, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981) and *J.B.* at ¶ 26.

{¶ 33} Considering all the circumstances surrounding mother's request for a continuance, we conclude the trial court did not abuse its discretion in denying her a continuance.  When substitute counsel for mother requested a continuance on the day of trial, she noted that assigned counsel believed the hearing was a pre-trial conference, not a full trial.  Despite substitute counsel stating she did not feel prepared to proceed to trial, the

trial court noted substitute counsel was listed as counsel for mother and was "competent and well qualified to handle" the case. (Mar. 3, 2025 Tr. at 34.) Substitute counsel did not articulate a particular length for the requested continuance. Mother argues it was generally unfair to require her to go to trial with substitute counsel, but mother does not articulate any specific deficiencies she faced by proceeding with substitute counsel.

{¶ 34} We also note that although the trial court denied mother's continuance request, it did, after the first day of testimony, continue the matter for one month before resuming and concluding the trial. (Mar. 3, 2025 Tr. at 79.) The trial court specifically addressed mother before continuing the matter, reminding her it was her responsibility to demonstrate her compliance with the case plan objectives. (Mar. 3, 2025 Tr. at 79.) Thus, although the trial court did not grant mother's initial continuance request, it did ultimately continue the matter and allow for further presentation of evidence. Both assigned counsel and substitute counsel were present when trial resumed on April 3, 2025.

{¶ 35} R.C. 2151.414(A)(2) requires a trial court to hold a trial on a PCC motion no later than 120 days after the agency files the motion except for "good cause" shown for a reasonable continuance. Generally, a trial court does not abuse its discretion in denying a request for a continuance when the PCC hearing is already past the 120-day deadline contained in R.C. 2151.414(A)(2). *J.R.*, 2024-Ohio-5619, at ¶ 8 (10th Dist.), citing *In re J.C.*, 2011-Ohio-715, ¶ 46 (10th Dist.). By the time of the March 3, 2025 trial, the PCC motion had already been pending for 213 days, and the trial court had granted 4 prior continuances. Additionally, by the time of the permanent custody hearing, A.S. had been in the custody of FCCS since March 6, 2023, with the potential for adoptive placement with her current kinship caregivers. *J.R.* at ¶ 8, citing *In re J.M.*, 2015-Ohio-3988, ¶ 26 (10th Dist.) (a trial court may consider the child's length of time in foster care and potential for adoptive placement as a relevant factor in determining whether to grant or deny a requested continuance).

{¶ 36} Though mother argues she was not responsible for her assigned counsel's vacation, mother does not articulate how granting another continuance when A.S. had already been in the temporary custody of FCCS for nearly two years would have been in A.S.'s best interest. The trial court reserved ruling on the continuance request until it heard evidence to determine whether any circumstances had changed since the guardian ad litem

filed his report recommending PCC. Ms. Morgan's testimony, provided before the trial court ruled on the continuance request, demonstrated mother largely failed to participate in the case during its nearly two-year duration. *In re K.J.*, 2018-Ohio-471, ¶ 22 (10th Dist.), citing *B.G.W.*, 2008-Ohio-3693, at ¶ 24-28 (10th Dist.) (trial court did not abuse its discretion in denying a continuance request made on the day of hearing where parent had failed to show a commitment and willingness to meet the case plan objectives during the pendency of the case).

{¶ 37} Mother does not argue the result of the trial would have been different had she been granted a continuance. *In re K.R.*, 2023-Ohio-359, ¶ 18 (10th Dist.) (no abuse of discretion in denying continuance request where father did not argue granting the continuance "would have impacted the trial court's ultimate decision" regarding permanent custody). "This court has repeatedly affirmed continuance denials in [PCC] cases where there is no showing that a granting of the continuance request likely would have changed the outcome of the case." *Id.*, citing *In re J.J.*, 2022-Ohio-907, ¶ 24 (10th Dist.) ("putative father makes no argument that a delay in proceedings" would have enabled him to provide "any additional testimony or evidence that would have had an impact on the trial court's ultimate decision regarding permanent custody"); *In re A.P.*, 2009-Ohio-438, ¶ 5-6 (10th Dist.) (no abuse of discretion in denying continuance where mother did not show a continuance would have "remedied the many ways [she] failed to comply with even the basics of the case plan"). Instead, mother's own testimony on the second day of trial confirmed much of the testimony of the FCCS caseworker and the guardian ad litem that mother had not made meaningful progress toward reunification. Indeed, mother conceded she was not seeking custody of A.S. Thus, mother does not show a continuance likely would have changed the disposition of the case.

{¶ 38} Mother argues it was unfair to require her to proceed to trial with substitute counsel. Though the trial court initially denied the continuance, it did ultimately continue the matter to a date where both assigned counsel and substitute counsel attended to represent mother. On this record, we cannot say the trial court abused its discretion in denying the initial continuance request made on the day of trial. Accordingly, we overrule mother's first assignment of error.

## V.  Second Assignment of Error—Ineffective Assistance of Counsel

{¶ 39} In her second and final assignment of error, mother argues she received ineffective assistance of counsel.

{¶ 40} Pursuant to R.C. 2151.352, a parent "is entitled to representation by legal counsel at all stages of the proceedings" involving termination of parental rights.  The right to counsel " 'also arises from the guarantees of due process and equal protection contained within the constitutions of Ohio and the United States.' "  *In re Baby Boy N.*, 2021-Ohio-1272, ¶ 41 (10th Dist.), quoting *In re Brooks*, 2004-Ohio-3887, ¶ 24 (10th Dist.), citing *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980), paragraph two of the syllabus.

{¶ 41}  The test for ineffective assistance of counsel in cases involving the involuntary termination of parental rights is the same as the test for ineffective assistance of counsel in criminal cases set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *Baby Boy N.* at ¶ 42, quoting *Brooks* at ¶ 24, citing *In re McLemore*, 2001 Ohio App.LEXIS 1249 (10th Dist. Mar. 20, 2001).  A party asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by "prevailing professional norms," and (2) counsel's deficient performance prejudiced the party.  *State v. Spaulding*, 2016-Ohio-8126, ¶ 77, quoting *Strickland* at 694.

{¶ 42}  To show trial counsel's performance was deficient or unreasonable, the party must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment.  *Strickland* at 689.  Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance.  *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998).  Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel.  *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991).  Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client.  *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 43} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "  *Bradley* at 142, quoting *Strickland* at 694.  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  *Id.*, quoting *Strickland* at 694.

{¶ 44} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. If a party cannot show the requisite prejudice under the second prong of *Strickland*, we need not address the first prong of *Strickland* concerning deficient performance. *State v. Wade*, 2021-Ohio-4090, ¶ 19 (10th Dist.), quoting *State v. Cosolis*, 2002-Ohio-4302, ¶ 53 (10th Dist.).

{¶ 45} Mother asserts her assigned counsel was ineffective in failing to notify the trial court of his vacation and sending substitute counsel in his place without adequately preparing her for trial. Despite mother's concerns with counsel's performance, she fails to articulate any prejudice from substitute counsel proceeding to trial in place of assigned counsel. Mother does not challenge the trial court's determination that granting FCCS's motion for permanent custody was in A.S.'s best interest. Mother concedes she did not comply with her case plan and expressly stated she was not seeking custody of A.S. The FCCS caseworker, the guardian ad litem, and the kinship caregiver all expressed concerns about mother's ongoing stability and mental health.

{¶ 46} We are sympathetic to mother's desire to maintain contact with A.S. despite her acknowledgment that A.S. should not be returned to her care, but we are mindful of the procedural posture of the case as a motion for permanent custody. Although mother advocated for legal custody to V.C. instead of permanent custody to FCCS, no party filed a motion for legal custody to V.C., and V.C. repeatedly stated she was not open to legal custody. *See* R.C. 2151.353(A)(3) ("If a child is adjudicated an abused, neglected, or dependent child, the court may . . . [a]ward legal custody of the child to either parent or to any other person who, ***prior to the dispositional hearing***, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. A person identified . . . as a proposed legal custodian shall be awarded legal custody of the child ***only if*** the person identified signs a statement of understanding for legal custody" containing specific provisions.). (Emphasis added.) While mother speculates assigned counsel may have presented convincing arguments to the court had he attended the first day of trial,

mother simply makes no argument that the result of the proceeding would have been different had assigned counsel been present at the March 3, 2025 hearing.

{¶ 47} Upon our review of the entire record—and in light of mother's inability to articulate any prejudice under the second prong of *Strickland*—we must conclude mother cannot establish a claim for ineffective assistance of counsel. *See State v. Williams*, 2025-Ohio-1151, ¶ 57 (10th Dist.) (without a demonstration of prejudice, we need not consider trial counsel's performance under the first prong of the *Strickland* analysis). We overrule mother's second and final assignment of error.

## VI. Disposition

{¶ 48} Based on the foregoing reasons, the trial court did not abuse its discretion in denying mother's request for a continuance on the first day of trial, and mother did not receive ineffective assistance of counsel. Having overruled mother's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

———————————